IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA <br> v. <br> MILAN PATEL | Criminal Action No. <br> 1:23-CR-126-LMM |

**Government's Sentencing Statement**

The United States of America, by Richard Moultrie, Acting United States Attorney, and Alex R. Sistla, Assistant United States Attorney for the Northern District of Georgia, files this sentencing statement with respect to Defendant Milan Patel: (i) outlining the government's sentencing recommendation; (ii) setting forth the government's view of the correct advisory Guidelines calculation; and (iii) providing a brief discussion of the relevant § 3553(a) factors. Sentencing is scheduled for Thursday, January 23, 2025.

The Presentence Investigation Report (PSR) correctly determined that Patel's advisory Guidelines range is 18-24 months' imprisonment based on Total Offense Level of 15 and Criminal History Category I (PSR ¶¶ 75, 80, Part D – Sentencing Options). The government will recommend at sentencing—consistent with the terms of the plea agreement—that the Court sentence Patel to 24 months' imprisonment and impose a fine within the applicable range commensurate with his ability to pay. (*See* R. 25-1, Plea Agreement ¶¶ 20-21).[1] If

---

[1] The PSR concluded that Patel has "the ability to pay a fine within the fine guidelines range for this case." (PSR ¶ 112); *see also* USSG § 5E1.2(a) ("The court shall

1

the Court imposes a custodial sentence, the government also requests that the Court impose a three-year term of supervised release.

## Background

*The Market Manipulation Scheme*

In April 2023, a federal grand jury returned a 16-count indictment against Patel charging him with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) & 77ff(a), and 17 C.F.R. § 240.10b-5; seven counts of Title 15 securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349, and seven counts of Title 18 securities fraud, in violation of 18 U.S.C. § 1348. (Doc. 1, Indictment; PSR ¶¶ 1-17). [2] The 40-page indictment detailed a brazen market manipulation scheme in which Patel and four other individuals—Bart Ross, Mark Melnick, Charles Parrino, and Anthony Salandra—traded on fraudulent rumors for years. (*Id.* ¶¶ 1-90; PSR ¶¶ 33-37, 39-40, 53). As alleged in the indictment and detailed in the PSR, Patel and his co-conspirators

---

impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.").

[2] At the time Patel was indicted, the remaining conspirators had pleaded guilty to criminal informations charging them with conspiracy to commit wire and securities fraud. *See United States v. Ross*, 1:20-cr-432-LMM (guilty plea entered Dec. 18, 2020); *United States v. Melnick*, 1:21-cr-300-LMM (guilty plea entered Sept. 17, 2021); *United States v. Salandra*, 1:22-cr-53-LMM (guilty plea entered April 11, 2022); *United States v. Parrino*, 1:22-cr-280-LLM (guilty plea entered Sept. 27, 2022). And as the Court is aware, Ross, Melnick, Salandra, and Parrino, each cooperated with the government, including meeting with investigators on multiple occasions. Patel never did so.

conceived, drafted, and disseminated false rumors about publicly traded companies and then profitably traded on these rumors by purchasing and selling (primarily) short-term call options. (PSR ¶¶ 34-36). These rumors needed to be carefully crafted because they had to both: (i) appear plausible enough (*i.e.*, seemingly legitimate) to other market participants to move the price of the underlying security (whether it be the underlying stock or option); and (ii) move the price of the security in a particular direction—namely move the stock or option price up—so that Patel and the other conspirators could profitably trade on the rumors. Patel and the co-conspirators relied upon their combined decades of experience as day traders and/or brokers to craft and disseminate these market-moving rumors and profitably trade on them by acquiring positions shortly before the dissemination of the rumors and then relatively quickly closing their positions after the option (or stock) price moved. (PSR ¶ 36). Their scheme ended in January 2020 when the FBI simultaneously executed search warrants at their residences in Georgia, Florida, and New Jersey. While the conspiracy was ongoing, Patel executed at least 119 trades consistent with the market manipulation scheme, netting him $1,125,263 in ill-gotten profits. (PSR ¶ 50).

On August 20, 2024, Patel pleaded guilty to Count One of the indictment, conspiracy to commit securities fraud. (Docs. 25, 25-1).

*Probation's Guidelines Calculation*

In the final PSR, Probation based Patel's advisory Guidelines range on the following:

- Base Offense Level of 6. (PSR ¶ 64).
- 14-level increase because Patel's offense resulted in a loss that exceeded $550,000 but was less than $1,500,000. (PSR ¶ 65).
- 2-level reduction because Parrino is a Zero-Point Offender. (PSR ¶ 74).
- 3-level reduction for acceptance of responsibility and timely notification. (PSR ¶¶ 72, 73).

Accordingly, Probation determined that Patel's advisory Guidelines range is 18-24 months' imprisonment based on a Total Offense Level of 15 and Criminal History Category I. (PSR ¶¶ 75, 80; PSR—Part D. Sentencing Options). Although the parties filed objections to the initial PSR, those have been since resolved, and there are no remaining objections to the Guidelines calculation.

**Argument**

*The Court should sentence Patel to 24 months' imprisonment, impose a fine within the applicable range, and place him on three years of supervised release.*

First, the nature and circumstance of Patel's offense merit a 24-month custodial sentence. As the government has previously explained during the sentencings for Patel's co-conspirators—and this Court has itself recognized—there is no serious dispute that the securities fraud scheme here was a serious offense, one that reflected careful planning, deliberation, and continued for years. It was not the product of an isolated mistake on Patel's part, but the

4

purposeful exploitation of the market by him and the co-conspirators. By the time the conspiracy was in full swing, Patel had been a day trader for nearly a decade and relied upon not only his own experience but the years of accumulated knowledge and financial acumen of his co-conspirators to successfully exploit the options market. (PSR ¶¶ 33, 106; *see also* PSR ¶¶ 30-32). The seriousness of Patel's offense is further underscored by the fact that he netted more than $1 million from the scheme by successfully executing over 100 trades based on materially fraudulent rumors that other co-conspirators initially conceived and drafted but were ultimately refined based on Patel's direct input to maximize their impact. (PSR ¶¶ 19, 26; Ex. A, FD-302 A. Salandra (Feb. 2022) at 4-7; Ex. B, FD-302 C. Parrino (Dec. 2022) at 2; Ex. C, FD-302, A. Salandra (Jan. 2023) at 1-2).

And though Patel was not responsible for crafting the fraudulent rumors in the first instance, he played an essential role in conspiracy—effectively acting as a gatekeeper to what information would be disseminated. Within the context of the charged conspiracy, Patel controlled not only which fraudulent rumors would be disseminated, but when they would be disseminated, and even which stocks would be impacted. (Ex. A, FD-302 A. Salandra (Feb. 2022) at 7; Ex. B, FD-302 C. Parrino (Dec. 2022) at 2; Ex. C, FD-302, A. Salandra (Jan. 2023) at 2-3). It is abundantly clear that absent Patel's participation, the conspiracy would never have been successful because it was his contacts and his distribution list that made it possible for the rumors to have the necessary market moving impact that

they did. (*See, e.g.*, Ex. B, FD-302 C. Parrino (Dec. 2022) at 1 ("Parrino advised the scheme would not have existed without Patel and Patel's contacts.")).

Second, there is nothing in Patel's history and characteristics that would warrant a downward variance to a non-custodial sentence. The PSR reports that Patel had a fairly ordinarily upbringing, attended college, was married with kids, remains close to his parents, and earned a substantial income from day-trading. (PSR ¶¶ 86-92, 100-102, 111). Patel himself reports that "he had a great relationship with his family," "enjoyed spending time with them," and never suffered from any "abuse in his home or any alcohol or drug concerns." (PSR ¶ 88). Nor has Patel identified any medical or mental health issues, or substance abuse problems that might explain or account for—though not excuse or justify—his criminal conduct. (PSR ¶¶ 96-99). Patel has also not suggested that he is an essential caretaker for his wife or anyone else in his family that might warrant a downward variance. *Cf.* USSG § 5H1.6, cmt. n. 1(B)(i); PSR ¶ 86 (noting Patel's parents reside with his sister).[3] And lastly, neither Patel's felony status nor its impact on his ability to work as a day trader would justify a downward

---

[3] The Guidelines disfavor downward departures because of family ties and responsibilities. USSG § 5H1.6. And while the Court retains the authority to downward vary based on a defendant's family circumstances, Section 3553(a)(5) nevertheless requires the Court to consider "any pertinent policy statement" issued by the Sentencing Commission in fashioning a sentence. 18 U.S.C. § 3553(a)(5). Here, the pertinent statement notes that a departure may be appropriate based if a defendant's sentence "will cause a substantial, direct, and specific loss of essential caretaking . . . to the defendant's family." USSG § 5H1.6, cmt. n. 1(B)(i). At sentencing, the government will further address the letters Patel submitted regarding his personal character. (Doc. 28, Def. Sent. Memo, Ex. A – Ex. S).

variance to a non-custodial sentence. *See United States v. Howard*, 28 F.4th 180, 214-15 (11th Cir. 2022) (district court abused its discretion by downward varying based on the fact that the defendant lost her medical license because of her felony convictions and she "will [now] have to live . . . the rest of her life as a convicted felon"); *id.* at 215 ("A factor that exists in more than nineteen out of twenty cases is not a proper basis for varying upward or downward from the guidelines range. It is just an expected, ordinary, everyday fact of life for defendants sentenced under the guidelines."); *see also United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (holding that the district court erred at sentencing by considering the collateral consequences of defendant's bank fraud conviction, including that he would likely lose his CPA license).

Third, while there is no great need for the Court's sentence to specifically deter Patel from future criminal conduct, there remains the need for the sentence to promote general deterrence. A need that that the Eleventh Circuit has repeatedly observed is "more apt, not less apt in white collar crime cases." *Howard*, 28 F.4th at 209. This is "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and alteration omitted). And here, the nature of Patel's crime—one that directly impacts the proper functioning of the nation' securities markets—supports a sentence that serves general deterrence, which is an "important goal of sentencing in white-collar crime prosecution[s]." *United States v. Kuhlman*, 711

F.3d 1321, 1328 (11th Cir. 2013). The need here is especially apt because the public must have confidence that the nation's securities markets are properly functioning and individuals who seek to exploit the markets through fraud and deceit will face serious, meaningful consequences.

Fourth, a sentence at the high-end of the Guidelines would not result in unwarranted sentencing disparities. Here, the government's recommendation reflects Patel's role in scheme, his lack of cooperation, and a seeming lack of remorse or contrition for his conduct. Patel chose not to cooperate with the government. And he chose not to resolve this case via a criminal information. He made these choices despite *every* co-conspirator pleading guilty and agreeing to cooperate against him. And he made these choices despite the overwhelming evidence conclusively demonstrating Patel's essential role in the conspiracy. These factors plainly distinguish Patel from any of his co-conspirators. *Cf. United States v. Docampo,* 573 F.3d 1091, 1101 (11th Cir. 2009) ("[D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial."); *see also United States v. Jayyousi*, 657 F.3d 1085, 1117-18 (11th Cir. 2011). Indeed, "[t]here is no unwarranted disparity even when the sentence the cooperating defendant receives is substantially shorter." *Docampo*, 573 F.3d at 1101 (quotation marks omitted).

The Eleventh Circuit has explained that "a sentence imposed in this circuit is [not] based subject to a national grade curve." *United States v. Hill*, 643 F.3d 807, 885 (11th Cir. 2001). Accordingly, Patel cannot demonstrate unwarranted

8

sentencing disparities based exclusively on statistical data or generalized evidence. *See, e.g.*, *Docampo*, 573 F.3d at 1102 (rejecting defendant's unwarranted-sentencing-disparity argument when defendant failed to identify a similarly situated defendant who received a lesser sentence); *United States v. Vaughn*, No. 21-11732, 2022 U.S. App. LEXIS 18678, at *7 (11th Cir. July 7, 2022) (citing *Hill* and *Docampo*).

Nevertheless, a recent report from the United States Sentencing Commission lends further support that sentencing Patel to 24 months' imprisonment would not result in unwarranted sentencing disparities. In September 2024, the Commission released its "Quick Facts" about sentencing in cases involving securities and investment fraud in Fiscal Year 2023. (Ex. D, US Sent. Commission Quick Facts – Securities & Investment Fraud).[4] The Commission reported that in FY-2023 the average sentence was 45 months, the median loss was $3.35 million, 91.5% of defendants were men, and 84.5% had little or no prior criminal history. (*Id.* at 1-2). Although a small majority of these defendants received a downward variance (53%), and the average reduction was 46.9%, these variances were based on an average Guideline minimum of 86 months. (*Id.* at 2). In other words, the advisory Guidelines sentence—before any variance—was more than 7 years and courts still imposed average sentences of nearly 4 years' imprisonment. (*Id.*).

---

[4] According to the Sentencing Commission, the "Quick Facts publications give readers basic facts about a single area of federal crime in an easy-to-read, two-page format. The Commission releases new Quick Facts periodically." (*See* USSC, Quick Facts, *available at* https://www.ussc.gov/research/quick-facts) (last accessed Jan. 21, 2025).

Comparing the loss caused by Patel's offense, his lack of criminal history, and considering the parties' plea agreement, imposing a 24-month sentence here would not result in unwarranted sentencing disparities to the extent that the Sentencing Commission's data may be relevant to that analysis.

* * * * *

For the foregoing reasons—and any additional ones advanced at sentencing—the Court should sentence Patel to 24 months' imprisonment, impose a fine within the applicable guideline range, and place him on 3 years' supervised release.

The Supreme Court has explained that while there need not be extraordinary circumstance to justify a non-Guidelines sentence, there still must be a "justification [that] is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 47, 50 (2007). In other words, a major variance requires a more significant justification than a minor one. *Id.* at 50. Here, Patel can offer no justification—significant or otherwise—that would warrant this Court varying downward from 24 months' imprisonment, let alone imposing a non-custodial sentence.

Respectfully submitted this 21st day of January 2025.

        Respectfully submitted,

        RICHARD MOULTRIE
          *Acting United States Attorney*

    /s/ALEX R. SISTLA
        *Assistant United States Attorney*
        Georgia Bar No. 845602
        alex.sistla@usdoj.gov